## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | CIVIL NO: _____ |
| *ex rel.* JESSE DAMSKY and | § | |
| OMAR ALNOBANI, | § | |
| | § | |
| Plaintiffs, | § | RELATOR JESSE DAMSKY |
| | § | AND OMAR ALNUBANI'S |
| v. | § | ORIGINAL COMPLAINT |
| | § | |
| MAERSK LINE, LIMITED, | § | |
| DAMCO USA, INC., | § | **FILED UNDER SEAL** |
| FARRELL LINES, | § | PURSUANT TO 31 U.S.C. § |
| DIPLOMAT FREIGHT SERVICES, INC., | § | 3730(b)(2) |
| and TYR LOGISTICS, INC., | § | |
| | § | |
| Defendants. | § | JURY TRIAL DEMANDED |

## RELATOR JESSE DAMSKY AND OMAR ALNOBANI'S
## ORIGINAL COMPLAINT

## TABLE OF CONTENTS

I.      Introduction to Case ...................................................................................................1

        A.      Background on USC Contracts ................................................................1

        B.      Overview of Defendants' Fraud ..............................................................2

II.     Jurisdiction and Venue ..............................................................................................3

III.    Introduction to Relators Jesse Damsky and Omar Alnobani ................................4

        A.      Background on Relator Jesse Damsky.....................................................4

        B.      Background on Relator Omar Alnobani ..................................................5

        C.      Original Source and Disclosures.............................................................6

IV.     Introduction to Defendants .......................................................................................6

        A.      Maersk Line, Limited .............................................................................6

        B.      Damco USA, Inc. ....................................................................................7

        C.      Farrell Lines ............................................................................................7

        D.      Diplomat Freight Services, Inc. ..............................................................8

        E.      TYR Logistics, Inc. .................................................................................8

V.      Respondeat Superior and Vicarious Liability .........................................................9

VI.     Federal Acquisition Regulation ("FAR") ..............................................................10

        A.      Overview................................................................................................10

        B.      Contracting by Negotiation....................................................................10

        C.      Contractor Responsibilities ...................................................................11

        D.      Submission of Claims to the Government ..............................................11

        E.      Contractor Certifications.......................................................................12

        F.      Prohibition of Bid Rigging and Other Collusive Antitrust Violations  .................12

G.       Consequences of Noncompliance .......................................................... 13

VII.    Anti-Kickback Act ................................................................................................ 14

A.       Overview ............................................................................................... 14

B.       Definition of Kickback ........................................................................ 14

C.       Prohibition of Kickbacks ..................................................................... 14

VIII.   Defendants' Collusive and Fraudulent Schemes ............................................. 15

A.       Despite DFS charging exorbitant rates that exceeded the rates Damco put in
         its bid to Farrell, Damco's management mandated exclusive use of DFS. .......... 15

B.       Damco's management colluded with DFS's management in the bidding
         process. ................................................................................................ 16

C.       DFS management induced Damco and MLL management to award flights
         to DFS. .................................................................................................. 16

D.       MLL, Damco, and DFS restructure the terms of the USC-7 contract. ................. 17

E.       MLL management is taking kickbacks from another subcontractor, TYR
         Logistics. ............................................................................................... 18

IX.     Actionable Conduct by Defendants ................................................................... 20

A.       False Claims Act ................................................................................... 20

         1.       Applicable Law ........................................................................ 20

         2.       Defendants' Violations of the False Claims Act ....................... 21

                  a.       Presentation of False or Fraudulent Claims (31 U.S.C. §
                           3729(a)(1)(A)) ............................................................... 21

                  b.       Making or Using False Records or Statements Materials to
                           False or Fraudulent Claims  (31 U.S.C. § 3729(a)(1)(B)) ............ 22

                  c.       Conspiracy (31 U.S.C. § 3729(a)(1)(C)) ...................................... 23

X.      Causes of Action ................................................................................................. 24

A.       Count I – Presentation of False or Fraudulent Claims (31 U.S.C. §
         3729(a)(1)(A)) ....................................................................................... 24

B.      Count II – Making or Using False Records or Statements Materials to False or Fraudulent Claims  (31 U.S.C. § 3729(a)(1)(B))................................................25

C.      Count III – Conspiracy (31 U.S.C. § 3729(a)(1)(C))............................................26

XI.     Demand for Jury Trial........................................................................................28

1.      On behalf of the United States of America, Plaintiff/Relators Jesse Damsky and Omar Alnobani (collectively, "Relators") bring this action pursuant to the federal False Claims Act (FCA), 31 U.S.C. § 3729-3732. Relators seek to recover all damages, penalties, and other remedies established by the FCA on behalf of the United States and would respectfully show the following:

## I.      INTRODUCTION TO CASE

### A.      Background on USC Contracts

2.      The United States Transportation Command (USTRANSCOM) is responsible for creating and implementing global deployment and distribution solutions in support of the President, Secretary of Defense, and Combatant Commander-assigned missions. USTRANSCOM directs and supervises execution of the strategic distribution system and has had the authority to procure commercial transportation services since September 2003. USTRANSCOM uses trucks, trains, rail cars, aircraft, ships, information systems, and a global transportation infrastructure to move people, supplies, equipment, and defense systems around the world daily.

3.      USTRANSCOM partners with companies in the private sector to accomplish its mission, which includes providing international transportation in support of Department of Defense activities in the Middle East. In 2003, USTRANSCOM issued the first Request for Proposal (RFP) for the Universal Services Contract (USC). The USC contract, which has been modified and extended many times, is the contract USTRANSCOM uses to procure transportation services.

4.      In August 2008, USTRANSCOM issued an RFP for USC-6 (HTC711-08-R-0011), which provides for international cargo transportation using ocean carriers to support DoD peacetime and contingency operations. The USC-6 contracts included a 1-year base period from

April 2009 through March 2010, with 1-year option periods starting from April 2010 through March 2012.

5.       The USC-7 contract (HTC711-12-D-W013[1]) commenced in August 2012 and was awarded to Maersk Line, Limited ("MLL").[2] This contract was an indefinite delivery contract funded by the Surface Deployment and Distribution Command (DOD - Army - AMC), and the potential value of the award was $2,316,604,172. Multiple task orders were awarded.

6.       The USC contract currently in effect, USC-9 commenced in July 2019 and is set to expire in 2025.

**B.       Overview of Defendants' Fraud**

7.       In late November 2011, Pakistan closed its border and severed the US military's primary land supply route for moving cargo in and out of Afghanistan. The closure laid the foundation for the frauds that followed, as it created the need for the US DoD to start moving most of its cargo in and out of Afghanistan by air.

8.       MLL was a prime contractor on the USC contracts, and it subcontracted with Damco USA, Inc ("Damco"), which is essentially a middleman in the freight forwarding industry. Damco subcontracted with another company, Diplomat Freight Services (DFS), to arrange for the planes necessary to carry cargo to and from various destinations in the Middle East. DFS was not a major player prior to 2012, as cargo was infrequently moved by air due to cost.

9.       Relators worked for Damco USA and were involved in soliciting and reviewing bids from cargo carriers. They were instructed by Thomas Kristensen, Damco's Vice President and head of the Government & Defense (G&D) contracting department, that Damco was only

---

[1] The NAICS category for the award is 483111 - Deep Sea Freight Transportation. The PSC category is V115 - Vessel Freight.
[2] There was a temporary contract in place during the gap between when USC-6 ended and USC-7 began.

going to use DFS to move cargo. When Relators protested that DFS typically had the highest prices, they were told that Damco uses DFS on all contracts, and that things "balance out." It became obvious that someone at DFS was inducing Mr. Kristensen and others at Damco in order to win contracts. Relators also discovered that Mr. Kristensen was sharing bids from other companies with Steve McSweeney, the DFS front man and DFS's contact on the USC contracts, to influence the contracting process and see that DFS received the contracts.

\* \* \*

10.     In January 2020, Relators learned that there was a new fraudster on the scene, TYR Logistics. Relator Alnobani became aware of TYR's existence after the company he currently owns, Global Point for Food Distribution, lost a bid to them.

11.     TYR was founded by a convicted felon presently using the alias Marc Taylor. Another individual, Mike Chappel, partnered with Mr. Taylor at TYR but is no longer associated with the company. One of the Relators contacted Mr. Chappell to inquire about TYR, and Mr. Chappell related that Torbin Svenningsen and Marc Futch of MLL were taking kickbacks from Marc Taylor. Apparently, the parties struck a deal to slide all business to DFS through TYR now rather than Damco. TYR is required to move all subcontracted freight under the USC contract via DFS, at the exclusion of open competition as required by the Federal Acquisition Regulation (FAR). Mr. Chappell advised that the illegal relationship had gone on for several years and that he had the financial records to prove it.

## II.     JURISDICTION AND VENUE

12.     Jurisdiction and venue are proper in the Southern District of Illinois pursuant to the False Claims Act (31 U.S.C. § 3732(a)), because Relators' claims seek remedies on behalf of the United States for multiple violations of 31 U.S.C. § 3729, some of which occurred in the Southern

District of Illinois. Defendants engage in business in the Southern District of Illinois and are subject to general and specific personal jurisdiction pursuant to 31 U.S.C. § 3732(a) in that the claims for relief in this action are brought on behalf of the United States for multiple violations of 31 U.S.C. § 3729.

### III.   INTRODUCTION TO RELATORS JESSE DAMSKY AND OMAR ALNOBANI

**A.   Background on Relator Jesse Damsky**

13.   Relator Jesse Damsky served in the United States Army and was stationed in Baghdad from 2004 to 2005. After receiving an honorable discharge in May 2006, he returned to the United States and became a Company Commander in the Army Reserves. He also did some humanitarian work for Iraqi children.

14.   Mr. Damsky has a degree in International Trade with a minor in Arabic from Georgia Southern University. He began working for Agility Defense & Government Services as a project manager in 2007 and moved to Jordan. He also worked as a business development manager for the Al-Elaf Group in Jordan from 2009 to 2010. In June 2010, Mr. Damsky joined the Maersk Group and began working for Damco, initially as the Defense project manager. In September 2010, Mr. Damsky was promoted to Jordan Country manager and then became the Jordan & Iraq Cluster Manager in January 2011. Damco's operations included trucking, security, port services, and customs clearance procedures. Mr. Damsky was directly responsible for over 57 million USD in business and 33 employees.

15.   Mr. Damsky stayed in Jordan until 2014 and then moved from Damco to APM Terminals, which is the Ports division of the Maersk Group. He then moved to Muscat and Salalah Oman and ultimately became the Chief Commercial officer in the Port of Salalah. Mr. Damsky

worked for APM Terminals until March 2019. He now resides in Buenos Aires and serves as the Commercial Director for the TecPlata container terminal in Argentina, part of the ICTSI Group.

**B.      Background on Relator Omar Alnobani**

16.      Relator Omar Alnobani has over fifteen years of experience working in the Middle East in various areas, including logistics, supply chain, warehousing, food distribution, and government and defense projects. He worked for Agility Logistics in Jordan from 2005 to 2010. He began as a Logistics Coordinator and assistant to the Operations Manager. Mr. Alnobani was later promoted to Supply Chain Analyst, overseeing logistical issues related to Agility's air, ocean, and land freight business on a broader level.

17.      Mr. Alnobani and Mr. Damsky met while both were working for Agility. In 2010, Mr. Damsky was working for Damco in Jordan, and he hired Mr. Alnobani to assist with Maersk defense projects. Mr. Alnobani served as a project manager on multiple contracts and mainly worked on defense contracts related to operations in Jordan, Iraq, and Afghanistan. Mr. Alnobani had a number of responsibilities, such as vetting suppliers and vendors to make sure they complied with DoD requirements.

18.      After Mr. Damsky left Jordan in 2014 to work for APM Terminals, Mr. Alnobani succeeded him as the Country Manager for both Jordan and Iraq. Mr. Alnobani supervised the sales, operations, and finance teams in both countries. In 2015, Mr. Alnobani left Damco and established a new company, Global Point for Food Distribution, which imports various food products, warehouses them, and distributes them to the local market. Mr. Alnobani is the Managing Partner for the business and still resides in Jordan.

## C.    Original Source and Disclosures

19.    There are no bars to recovery under 31 U.S.C. § 3730(e), or in the alternative, Relators are original sources as defined therein. Relators have direct and independent knowledge of the information on which their allegations are based. To the extent that any allegations or transactions herein have been publicly disclosed, Relators have knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions and provided this information to the United States prior to filing a complaint by serving voluntary pre-filing disclosure statements on June 22, 2020 and August 21, 2020.

20.    As required pursuant to 31 U.S.C. § 3730(b), Relators will submit an original disclosure statement to the Attorney General of the United States and the United States Attorney for the Southern District of Illinois contemporaneously with the service of his Original Complaint.

## IV.    INTRODUCTION TO DEFENDANTS

## A.    Maersk Line, Limited

21.    Defendant Maersk Line, Limited ("MLL") was incorporated in Virginia in 1983. MLL's corporate office is located at 2510 Walmer Avenue, Suite C, Norfolk, Virginia 23513. MLL's registered agent is C T Corporation System, 4701 Cox Rd., Suite 285, Glen Allen, Virginia 23060.

22.    MLL is the US-based Maersk office responsible for managing Maersk's business with the United States Government. It is the primary interface for major contracts such as USC. Torbin Svenningsen and Marc Futch are presently the senior MLL managers controlling USC subcontracts.

23.    MLL manages the world's largest fleet of internationally trading US-flag vessels. It provides multimodal transportation, ship management, maritime technical services, and logistics

services to customers from over 300 ports around the world. MLL is a subsidiary of the A.P. Møller

Mærsk Group (Maersk Group).

**B.      Damco USA, Inc.**

24.     Defendant Damco USA, Inc. ("Damco") specializes in worldwide freight

forwarding services.  Damco was incorporated in Delaware on July 14, 1988 and maintains its US

headquarters at 9300 Arrowpoint Blvd., Charlotte, North Carolina 28273. Damco may be served

through its registered agent, C T Corporation System, 208 S. Lasalle St., Suite 814, Chicago,

Illinois 60604.

25.     For more than thirty years, Damco has provided freight forwarding and supply

chain management services, and it is one of the largest providers of transportation services around

the world. Damco USA, Inc. is a subsidiary of Damco International A/S, which is a subsidiary of

the Maersk Group.

**C.      Farrell Lines**

26.     Defendant Farrell Lines ("Farrell") was incorporated in Virginia on February 6,

2012. Farrell's corporate office is located at 2510 Walmer Avenue, Suite C, Norfolk, Virginia

23513. Farrell may be served through its registered agent, C T Corporation System, 4701 Cox Rd.,

Suite 285, Glen Allen, Virginia 23060.

27.     Farrell was formed to target the roll-on/roll-off (RORO) US DoD business. While

MLL deals primarily with cargo containers, Farrell manages RORO vessels (car carriers), which

are more apt for military vehicles. Years before its incorporation in Virginia, Farrell was an old,

sold out, American carrier. After purchasing the corporation from P&O Nedlloyd Container Line

Ltd. in 2005, Maersk resurrected Farrell in order to have a US-based RORO carrier to bid on the

USC projects as another name. Farrell is a subsidiary of the Maersk Group and takes its marching orders directly from MLL.

**D.     Diplomat Freight Services, Inc.**

28.     Defendant Diplomat Freight Services, Inc. ("DFS") has provided global freight forwarding services by air and ocean for both the commercial and Government sectors for almost forty years. Specifically, DFS provides packaging and third-party logistics services. DFS was incorporated in 1981. Its corporate headquarters are located at 105 Eastern Avenue, Suite 103, Annapolis, Maryland 21403. DFS may be served through its registered agent, William E. Carlson, 250 West Pratt Street, Suite 2000, Baltimore, Maryland 21201.

29.     DFS specializes in air cargo movement in the Middle East but does not actually own aircraft; rather, it functions as a freight forwarder. When MLL, Farrell Lines, or Damco need to move cargo for the DoD by air, they utilize DFS. DFS regularly uses Ark Airlines and Zet Avia to transport the cargo for MLL and its associated companies performing work under the USC. Steve McSweeney and Tommy Green handle all DFS interactions with MLL and associated companies for the USC contract.

**E.     TYR Logistics, Inc.**

30.     Defendant TYR Logistics, Inc. ("TYR") was incorporated in Wyoming in 2014, and the principal office on record with the Wyoming Secretary of State is located at 1621 Central Ave., Cheyenne, Wyoming 82001. TYR lists its registered agent as Wyoming Registered Agent with the same address as its principal office, 1621 Central Ave, Cheyenne, Wyoming 82001. TYR is a relatively new freight forwarder in the Middle East and serves in the role of a "middleman" freight broker, similar to DFS, where it places cargo with other companies that actually perform the work.

31.     Marc Taylor is the President of TYR according to the website for the Wyoming Secretary of State, and his address is listed as 700 12th St. NW, Ste. 700, PMB 92901, Washington DC 20005, which is actually a virtual office. TYR is not registered to do business in Washington DC. Another individual, Mike Chappel, partnered with Mr. Taylor at TYR but is no longer associated with the company.

32.     Unless otherwise specified, Maersk Line, Limited, Damco USA, Inc., Farrell Lines, Diplomat Freight Services, Inc., and TYR Logistics, Inc. will be collectively referred to herein as "Defendants."

## V.      RESPONDEAT SUPERIOR AND VICARIOUS LIABILITY

33.     Any and all acts alleged herein to have been committed by Defendants were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the Defendants and within the course and scope of their employment, or by corporate predecessors to whom successive liability applies.

34.     Defendants MLL, Farrell, and Damco are related entities sharing common employees, offices, and business names such that they are jointly and severally liable. Further, the past, present and continuing relations and dealings by and between these related entities are so inextricably intertwined that for purposes of this suit, they should be considered as a single entity at law and equity.

35.     MLL and Farrell do not have a separate board responsible for their companies or business dealings. Rather, it is the A.P. Møller Mærsk Group board that oversees and manages both MLL and Farrell. MLL and Farrell share a common address at 2510 Walmer Avenue, Suite C, Norfolk, Virginia 23513. Damco USA, Inc. is a subsidiary of Damco International A/S, which

is a subsidiary of the Maersk Group. The diagram below illustrates the relationships between these entities:



## VI.    FEDERAL ACQUISITION REGULATION ("FAR")

### A.    Overview

36.     The Federal Acquisition Regulation ("FAR") is a system of regulations jointly issued by the Department of Defense, the U.S. General Services Administration, and the National Aeronautics and Space Administration for use in acquiring goods and services in a uniform manner for government contracts.  The FAR is codified in Title 48 of the United States Code of Federal Regulations.

37.     The Defense Federal Acquisition Regulation Supplement ("DFARS") is a system of regulations administered by the Department of Defense for the purpose of implementing and supplementing the FAR. DFARS establishes delegations of FAR authorities, deviations from FAR requirements, DoD-wide policies, and should be read in conjunction with the primary set of rules in the FAR.

### B.    Contracting by Negotiation

38.     Part 15 of the FAR describes the policies and procedures for awarding and entering into a negotiated contract.  A contract awarded using a process other than a sealed bid process is a

negotiated contract. *See* 48 C.F.R. § 15.000. The objective of selecting a source for an item under a negotiated contract is to select the proposal that represents the best value. *See* 48 C.F.R. § 15.302. "Best value" means the expected outcome of an acquisition that, in the Government's estimation, provides the greatest overall benefit in response to the requirement. *See* 48 C.F.R. § 2.101(b)(2).

39.     An award is based on many evaluation factors.  Although the evaluation factors are largely discretionary and depend upon the particular contract at issue, certain factors must be taken into consideration, including the price or cost to the Government, the quality of the service provided, and the past performance. *See* 48 C.F.R. § 15.304(b).

**C.     Contractor Responsibilities**

40.     Pursuant to 48 C.F.R. § 46.105(a), the "contractor is responsible for carrying out its obligations under the contract by: (1) controlling the quality of supplies or services; and, (2) Tendering to the Government for acceptance only those supplies or services that conform to contract requirements." The control of quality by the contractor may relate, but is not limited, to "procedures and processes for services to ensure that services meet contract performance requirements." 48 C.F.R. § 46.105(c).

**D.     Submission of Claims to the Government**

41.     Pursuant to 48 C.F.R. § 32.905(a), the basis for payment is on receipt of a proper invoice and satisfactory contract performance.  With the limited exception of interim payments on cost-reimbursement contracts for services, all invoice payments must be supported by a receiving report or any other Government documentation authorizing payment. *See* 48 C.F.R. § 32.905(c). Documentation must include, at a minimum, description of the supplies delivered, or services performed, and quantities of supplies received and accepted, or services performed. *See* 48 C.F.R. § 32.905(c)(2) and (3).

42.     Pursuant to 48 C.F.R. § 32.007(a)(1), contract financing payments are due the thirtieth day after the designated billing office receives "a proper contract financing request." A proper contract financing request "must comply with the terms and conditions specified by the contract," and the contractor must correct any defects in requests submitted. 48 C.F.R. § 32.007(c).

## E.     Contractor Certifications

43.     The general FAR invoice requires the contractor to certify that the voucher is proper.  Specifically, Standard Form 1034 states, before the contractor's signature line: "I certify that this voucher is correct and proper for payment."  48 C.F.R. § 53.301-1034.  By certifying that the voucher is proper for payment, the contractor certifies that the voucher is a good faith request for payment in accord with the contract.

44.     Contractors are also required to make the following certifications when submitting any claim exceeding $100,000: "I certify that the claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the contractor believes the Government is liable; and that I am duly authorized to certify the claim on behalf of the contractor." 48 C.F.R. § 33.207(c).

## F.     Prohibition of Bid Rigging and Other Collusive Antitrust Violations

45.     During the bidding process, the offeror must certify that the prices in the offer have been "arrived at independently, without, for the purpose of restricting competition, any consultation, communication, or agreement with any other offeror or competitor relating to those prices." 48 C.F.R. § 52.203-2(a)(1)(i). The prices in the offer must not have been "knowingly disclosed by the offeror, directly or indirectly, to any other offeror or competitor before bid opening (in the case of a sealed bid solicitation) or contract award (in the case of a negotiated

12

solicitation) unless otherwise required by law." 48 C.F.R. § 52.203-2(a)(2). No attempt can be made by the offeror to induce any other offeror or competitor "to submit or not to submit an offer for the purpose of restricting competition." 48 C.F.R. § 52.203-2(a)(3).

46.     Pursuant to 48 C.F.R. § 3.303(b), "the antitrust laws are intended to ensure that markets operate competitively." Therefore, agreements made among competing entities that restrain "the natural operation of market forces [are] suspect." Activities that evidence an antitrust violation may include: "an industry price to which contractors refer in formulating their offers, a sudden change from competitive bidding to identical bidding, simultaneous price increases or follow-the-leader pricing, rotation of bids or proposals, division of the market, establishment by competitors of a collusive price estimating system, the filing of a joint bid by two or more competitors, any incidents suggesting direct collusion among competitors, and assertions by the employees, former employees, or competitors of offerors, that an agreement to restrain trade exists." 48 C.F.R. § 3.303(c)(1)-(9). Agencies are required "to report to the Attorney General any bids or proposals" that are suspected to be in violation of antitrust laws. 48 C.F.R. § 3.303 (a).

## G.     Consequences of Noncompliance

47.     A contractor may be debarred if found liable for commission of fraud in connection with obtaining, attempting to obtain, or performing a public contract. *See* 48 C.F.R. § 9.406-2(a)(1). Furthermore, knowing failure by a principal to timely disclose to the Government credible evidence of a violation of the False Claims Act, or significant overpayments on the contract, constitutes grounds for disbarment. *See* 48 C.F.R. § 9.406-2(b)(1)(vi)(B) and (C). The Government may reduce or suspend contract payments upon a finding of fraud. *See* 48 C.F.R. § 32.006-1(b).

## VII.   <span>ANTI-KICKBACK ACT</span>

**A.     Overview**

48.     "The Anti-Kickback Act of 1986 was passed to deter subcontractors from making payments and contractors from accepting payments for the purpose of improperly obtaining or rewarding favorable treatment in connection with a prime contract or a subcontract relating to a prime contract." 48 C.F.R. § 3.502-2. The Anti-Kickback Act is codified in Title 41, chapter 87, of the United States Code.

**B.     Definition of Kickback**

49.     Pursuant to both 48 C.F.R. § 3.502-1 and 41 U.S.C. § 8701(2), "kickback means any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind which is provided to any prime contractor, prime contractor employee, subcontractor, or subcontractor employee for the purpose of improperly obtaining or rewarding favorable treatment in connection with a prime contract or in connection with a subcontract relating to a prime contract."

**C.     Prohibition of Kickbacks**

50.     "The Kickbacks statute prohibits any person from providing, attempting to provide, or offering to provide any kickback." 48 C.F.R. § 3.502-2(a)(1). Additionally, the statute prohibits "soliciting, accepting, or attempting to accept any kickbacks." 48 C.F.R. § 3.502-2(a)(2). The statute also prohibits "including, directly or indirectly, the amount of any kickback in the contract price charged by a subcontractor to a prime contractor or a higher tier subcontractor or in the contract price charged by a prime contractor to the United States." 48 C.F.R. § 3.502-2(a)(3). These exact prohibitions are also stated in Title 41, chapter 87, section 8702 of the United States Code.

51.     Criminal penalties will be imposed on any person who "knowingly and willfully engages" in prohibited conduct such as kickbacks. 48 C.F.R. § 3.502-2(b). The United States can recover civil penalties "from any person who knowingly engages in such prohibited conduct and from any person whose employee, subcontractor, or subcontractor employee provides, accepts, or charges a kickback." 48 C.F.R. § 3.502-2(c).

### VIII.    DEFENDANTS' COLLUSIVE AND FRAUDULENT SCHEMES

52.     In late November 2011, Pakistan closed its border and severed the US military's primary land supply route for moving cargo in and out of Afghanistan. In December 2011, the US Army's 595th Transportation Brigade (SDDC) held a conference in Aqaba Jordan to discuss the need to ship via air due to the border closure. MLL selected National Air Cargo (NAC) to manage the flights for cargo booked on Maersk Line. Farrell Lines, which is partly-owned and fully-managed by MLL, awarded a subcontract to Damco, which subsequently subcontracted everything to DFS. Some of the flights were given to MLL and handled by NAC, while some were given to Farrell and handled by Damco and DFS. DFS was essentially a non-existent player in the USC contract before this time.

**A.    Despite DFS charging exorbitant rates that exceeded the rates Damco put in its bid to Farrell, Damco's management mandated exclusive use of DFS.**

53.     After the first flights in January 2012, Relators saw that DFS's rates were significantly higher than what Damco had put in its bid to Farrell and that Damco was losing money by utilizing DFS. Damco's loss was approximately $1 million for the first flights alone.

54.     After seeing such a high loss, Relators researched some potential carriers to use in place of DFS and discovered that DFS's rates were consistently 40% higher than the other carriers. They wanted Damco to include other bidders in the contracting process, and they fought for Damco to switch from DFS to a different carrier, such as NAC. Relators appealed to Thomas Kristensen,

Damco's Vice President and head of the Government and Defense department (G&D), and Brian Roberts, the G&D head of sales who reported directly to Mr. Kristensen.

55.     Relators were told by Mr. Kristensen and Mr. Roberts that they had to use DFS regardless of losses, because Damco had other business with DFS, including a contract with DynCorp whereby DFS handled air freight to Dubai. Relators were assured that things would balance out.

**B.     Damco's management colluded with DFS's management in the bidding process.**

56.     DFS front man, Steve McSweeney, and his boss, Tommy Green, handled all DFS interactions with MLL and associated companies for the USC contract.  Their primary points of contact within Damco were Mr. Kristensen and Mr. Roberts.

57.     When Relators did obtain quotes from other carriers and shared them with Mr. Kristensen, Mr. Kristensen and/or Mr. Roberts contacted Mr. McSweeney, shared the quote from the other carrier, and encouraged DFS to provide another quote. This happened on multiple occasions, and Relators became certain that Damco's confidential information was being shared with DFS. By March 2012, Damco had lost more than $7 million due to using DFS as the carrier on the USC contract.

**C.     DFS management induced Damco and MLL management to award flights to DFS.**

58.     In April 2012, Relators' bosses, Claudio Garibaldi, Damco's East Europe Cluster Manager, and Nick Kyrzakos, East Europe Regional CEO, permitted Relators to use other carriers to transport cargo to and from Jordan, which was under the East Europe region at that time in terms of Damco's organizational structure. Mr. Kyrzakos reported directly to Damco's CEO, Rolf Habben Jansen, and Mr. Kristensen, who also reported directly to Mr. Jansen, was unable to overrule the decision to use other carriers for Damco's Jordan business.

59.     From April 2012 through August 2012, Relators were permitted to collect bids from two other companies to provide air freight services to and from Jordan, Chapman Freeborn and Jordan International Air Cargo (JIAC). With one exception, Relators always used Chapman or JIAC for the Jordan business, because DFS's bids were much higher. The only time DFS won the bid was when it underbid the other carriers by a significant margin, which Relators suspected was due to Mr. Kristensen sharing competitors' bids with Mr. McSweeney. Damco utilized DFS exclusively for its contract with DynCorp, however, and Relators had no ability to change that.

60.     Based on the lack of concern about DFS's exorbitant charges, Relators strongly suspected that someone at DFS was paying kickbacks to Damco and MLL, and Mr. Damsky had a heated argument with Mr. Kristensen about that. It appears that beginning as early as 2012, Mr. McSweeney and Mr. Green were paying kickbacks to senior MLL managers, including Torbin Svenningsen, now the VP and COO, as well as Mr. Kristensen.

**D.    MLL, Damco, and DFS restructure the terms of the USC-7 contract.**

61.     In January 2013, Mr. Kristensen announced a new deal under the USC-7 contract in which MLL and DFS would contract directly rather than Damco and DFS contracting directly. Damco would only be able to bill a few pennies per pound for "managing" the contract, and DFS would charge MLL per pound of cargo.

62.     Even though Damco and MLL were making a higher profit when DFS was charging per flight, as it had been doing, the parties cut a deal allowing DFS to charge per pound of cargo rather than per flight. Damco billed a surcharge of five cents per pound on top of that. The players involved were Torbin Svenningsen with MLL, Thomas Kristensen, Brian Roberts, and Brian Andrusin with Damco, and Steve McSweeney and Tommy Green with DFS, and they made that deal to put more money in DFS's pocket, ultimately at the Government's expense. Damco and

MLL sold the arrangement to AP Moller Maersk management in the group by saying that it would reduce risk and guarantee revenue. In reality, Damco gave the gold pot and all of their business to DFS.

63.     Furthermore, Damco's per pound billing arrangement with DFS on the Dubai contract made no sense to Relators from a profit standpoint. Previously, DFS had billed Damco per flight, giving Damco and MLL the responsibility for filling the planes with cargo, which was more profitable for Damco. For instance, if a round trip flight from Dubai to Afghanistan and back cost $135,000, Damco could fill it with 45,000 kgs of cargo, which equates to roughly $1.60 per pound and a net profit of approximately $23,000 per flight.[3] Furthermore, if Damco had some cargo to take on the return flight, as it often did on the contract with DynCorp, the profit would go up exponentially, because the cost for the round trip is only slightly higher for the fuel consumption to lug the heavier weight.

64.     Damco managed all of DFS's other Government contracts, which eliminated competition and meant that Damco basically had to go with DFS. Damco did not choose a cheaper supplier, and it gave DFS all of the profit for maximizing the flights full of USC cargo. The actions of DFS management were rewarded, as DFS came to dominate the USC subcontracting market.

**E.     MLL management is taking kickbacks from another subcontractor, TYR Logistics.**

65.     Relators also discovered a similar and more recent scheme to defraud the Government involving a different player, TYR Logistics. TYR is a relatively new freight forwarder in the Middle East, and it serves in the role of a "middle-man" freight broker, similar to DFS, where it places cargo with other companies that actually perform the work. TYR has been brought into the fold of MLL subcontractors because of paying kickbacks to senior MLL management.

---

[3] 45,000 kg = 99,000 lbs x $1.60 = $158,000 - $135,000 = $23,000 net profit.

66.     TYR was initially started by a convicted felon presently using the alias Marc Taylor. Marc Taylor has used multiple names over the last thirty years. His original name is Marc Chapman, and in 1987, he plead guilty to breaking into a building on the campus of Arizona State University and stealing computer equipment. Marc Chapman subsequently changed his last name to Turi and obtained a new Social Security number. In March 2011, now an international arms dealer, Mr. Turi set up a $534 million deal to ship military weapons from Eastern Europe to rebel fighters in Libya's civil war. He was charged with violating US arms-export laws in 2014, but the charges were ultimately not pursued.

67.     Mr. Turi founded TYR in 2014 and continued to use the name Turi in association with TYR for several years. In February 2019, Mr. Turi filed an amended report with the Wyoming Secretary of State in which he deleted "Marc Turi" as TYR's President and added the alias he currently uses, "Marc Taylor." For simplicity's sake, Mr. Chapman/Turi/Taylor will be referred to as Marc Taylor herein.[4]

68.     Another individual, Mike Chappel, partnered with Mr. Taylor at TYR but is no longer associated with the company. One of the Relators contacted Mr. Chappell, and Mr. Chappell related that Torbin Svenningsen and Marc Futch of MLL were taking kickbacks from Marc Taylor. Apparently, the parties struck a deal to slide all business to DFS through TYR now rather than Damco. Mr. Chappell advised that he had financial records which document the illegal relationship.

69.     Mr. Chappell also stated that the illegal relationship between Marc Taylor of TYR, Mr. Svenningsen and Mr. Futch of MLL, and Steve McSweeney and Tommy Greene of DFS had

---

[4] For more information on Mr. Taylor's criminal activities while using the names Marc Chapman and Marc Turi, *see* Dennis Wagner, *Marc Turi: The mysterious saga of an Arizona arms dealer*, The Ariz. Repub. (Dec. 8, 2016), https://www.azcentral.com/story/news/local/arizona-investigations/2016/11/20/mysterious-saga-arizona-arms-dealer/94023174/.

gone on for several years. Any USC subcontract requests given to Farrell Lines or MLL were subsequently provided as subcontracts directly to DFS and TYR without competition. TYR is required to move all subcontracted freight the under USC contract via DFS, at the exclusion of open competition as required by the FAR.

## IX.   ACTIONABLE CONDUCT BY DEFENDANTS

**A.   False Claims Act**

**1.   Applicable Law**

70.     This is an action brought on behalf of the United States to recover damages and civil penalties arising from the false and/or fraudulent statements, claims, and acts by Defendants made in violation of the False Claims Act, 31 U.S.C. §§ 3729–3732.

71.     The FCA provides that any person who

(A)     knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B)     knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; or

(C)     conspires to defraud the Government by committing a violation of [the FCA]

is liable to the Government for a civil penalty of not less than $11,665 and not more than $23,331 for each such claim, plus three times the amount of damages sustained by the Government because of the false or fraudulent claim. *See* 31 U.S.C. § 3729(a)(1).

72.     The FCA defines "claim" as:

(A)     mean[ing] any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that--

(i)     is presented to an officer, employee, or agent of the United States; or

(ii)     is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government--

(I)     provides or has provided any portion of the money or property requested or demanded; or

(II)     will reimburse such contractor, grantee, or other recipient for any portion of the money   or   property which is requested or demanded. . . .

31 U.S.C. §3729(b)(2).

73.     The FCA allows any persons having knowledge of a false or fraudulent claim against the Government to bring an action in federal district court for the United States and to share in any recovery as authorized by 31 U.S.C. § 3730.

74.     Based on these provisions, Relators, on behalf of the United States, seek through this action to recover damages and civil penalties arising from Defendants' violations of the False Claims Act.

### 2.   Defendants' Violations of the False Claims Act

#### a.     Presentation of False or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(A))

75.     From 2012 to the present, Defendants have knowingly presented, or caused to be presented, false or fraudulent claims associated with the USC contracts.

76.     The provision of kickbacks between a prime contractor and its subcontractors is a violation of the Federal Anti-Kickback Act of 1986 and the FAR. The Anti-Kickback Act forbids the provision of "anything of value" between a prime contractor and its subcontractors in order to secure preferential treatment within the FAR-regulated contracting process.

77.     Claims tainted by violations of the Anti-Kickback Act are false or fraudulent claims prohibited under the False Claims Act.

78.     Defendants also engaged in bid rigging and other activities that run afoul of FAR.

79.     Pursuant to 48 C.F.R. § 32.905(a), the basis for payment is on receipt of a proper invoice and satisfactory contract performance. Defendants caused the United States to make payments for transportation services that it would not have made had it known the companies performing these services were offering or receiving kickbacks and were colluding during the bidding process.

80.     Defendants' violations of the Anti-Kickback Act and FAR were material, because they went to the very essence of the bargain for which the United States contracted. The United States believed it was paying for services untainted by kickbacks and provided in compliance with FAR. Had the United States known of Defendants' corrupt provision or receipt of kickbacks, which resulted in the submission of ineligible claims for reimbursement, the United States would not have paid the claims.

81.     By virtue of Defendants' actions, the United States has suffered damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

**b.     Making or Using False Records or Statements Material to False or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(B))**

82.     From 2012 to the present, Defendants knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims paid or approved by the United States. These false statements or records include Defendants' false certifications or representations of compliance with all laws in requesting payments for performing the contracts at issue in this case, including the Anti-Kickback Act and FAR. Defendants falsely certified, expressly or impliedly, that their statements were true, accurate, and correct.

83.     Defendants' express or implied false certifications of compliance with the Anti-Kickback Act and FAR were material, because they went to the very essence of the bargain for which the United States contracted. The United States believed it was paying for services untainted

22

by kickbacks and provided in compliance with FAR. Had the United States known of Defendants' corrupt provision or receipt of kickbacks, or their collusion during the bidding process, which resulted in the submission of ineligible claims for reimbursement, the United States would not have paid the claims.

84.     Given the structure of the Government contracting system at issue, the Defendants' conduct had the potential to influence the payment decisions of the Government. These certifications and false statements caused the Government to enter into contracts, approve subcontracts and modifications, pay false claims, and not rescind the contract or subcontract.

85.     Defendants' false records and statements were foreseeable factors in the United States' loss and a consequence of the scheme.  By virtue of Defendants' actions, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

### c.     Conspiracy (31 U.S.C. § 3729(a)(1)(C))

86.     By virtue of planning and implementing their schemes, Defendants' actions violated the False Claims Act, 31 U.S.C. § 3729(a)(1)(C).

87.     Specifically, Defendants conspired to control the USC subcontracts market via the circumvention of a fair bid process utilizing schemes involving complementary bids, provision of false bids, and the provision of "low-bid" information. Defendants conspired to enter into mutually beneficial subcontracts that resulted in higher profits at the Government's expense. Defendants' conspiracy included the provision of kickbacks in exchange for business and was material to the Government's loss.

88.     Defendants knowingly conspired to falsely certify that their statements were true, accurate, and correct. These false statements or records include Defendants' false certifications or

representations of compliance with all laws in requesting payments for performing the contracts at issue in this case.

89.     Defendants have conspired in knowingly presenting, or causing to be presented, false or fraudulent claims for payment or approval to the United States and have conspired in knowingly making, using, or causing to be made or used, false records or statements material to false or fraudulent claims. The United States has suffered substantial damages as a result of Defendants perpetrating their conspiracy.

## X.     CAUSES OF ACTION

### A.     Count I – Presentation of False or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(A))

90.     Relators reallege and hereby incorporate by reference each and every allegation contained in all paragraphs of this Complaint.

91.     From 2012 to the present, Defendants have knowingly presented, or caused to be presented, false or fraudulent claims associated with the USC contracts.

92.     The provision of kickbacks between a prime contractor and its subcontractors is a violation of the Federal Anti-Kickback Act of 1986 and the FAR. The Anti-Kickback Act forbids the provision of "anything of value" between a prime contractor and its subcontractors in order to secure preferential treatment within the FAR-regulated contracting process. Claims tainted by violations of the Anti-Kickback Act are false or fraudulent claims prohibited under the False Claims Act.

93.     Defendants also engaged in bid rigging and other activities that run afoul of FAR.

94.     Pursuant to 48 C.F.R. § 32.905(a), the basis for payment is on receipt of a proper invoice and satisfactory contract performance. Defendants caused the United States to make payments for transportation services that it would not have made had it known the companies

24

performing these services were offering or receiving kickbacks and were colluding during the bidding process.

95.     Defendants' violations of the Anti-Kickback Act and FAR were material, because they went to the very essence of the bargain for which the United States contracted. The United States believed it was paying for services untainted by kickbacks and provided in compliance with FAR. Had the United States known of Defendants' corrupt provision or receipt of kickbacks, which resulted in the submission of ineligible claims for reimbursement, the United States would not have paid the claims.

96.     The United States paid the false or fraudulent claims.

97.     By virtue of Defendants' actions, the United States has suffered damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

**B.     Count II – Making or Using False Records or Statements Material to False or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(B))**

98.     Relators reallege and hereby incorporate by reference each and every allegation contained in all paragraphs of this Complaint.

99.     From 2012 to the present, Defendants knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims paid or approved by the United States. These false statements or records include Defendants' false certifications or representations of compliance with all laws in requesting payments for performing the contracts at issue in this case, including the Anti-Kickback Act and FAR. Defendants falsely certified, expressly or impliedly, that their statements were true, accurate, and correct.

100.     Defendants' express or implied false certifications of compliance with the Anti-Kickback Act and FAR were material, because they went to the very essence of the bargain for which the United States contracted. The United States believed it was paying for services untainted

by kickbacks and provided in compliance with FAR. Had the United States known of Defendants' corrupt provision or receipt of kickbacks, or their collusion during the bidding process, which resulted in the submission of ineligible claims for reimbursement, the United States would not have paid the claims.

101.    Given the structure of the Government contracting system at issue, the Defendants' conduct had the potential to influence the payment decisions of the Government. These certifications and false statements caused the Government to enter into contracts, approve subcontracts and modifications, pay false claims, and not rescind the contracts or subcontracts. Defendants' false records and statements were foreseeable factors in the United States' loss and a consequence of the scheme.

102.    The United States paid the false or fraudulent claims.

103.    By virtue of Defendants' actions, the United States has suffered damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## C.    Count III – Conspiracy (31 U.S.C. § 3729(a)(1)(C))

104.    Relators reallege and hereby incorporate by reference each and every allegation contained in all paragraphs of this Complaint.

105.    Specifically, Defendants conspired to control the USC subcontracts market via the circumvention of a fair bid process utilizing schemes involving complementary bids, provision of false bids, and the provision of "low-bid" information. Defendants conspired to enter into mutually beneficial subcontracts that resulted in higher profits at the Government's expense. Defendants' conspiracy included the provision of kickbacks in exchange for business and was material to the Government's loss.

106.     Defendants knowingly conspired to falsely certify that their statements were true, accurate, and correct. These false statements or records include Defendants' false certifications or representations of compliance with all laws in requesting payments for performing the contracts at issue in this case.

107.     Defendants have conspired in knowingly presenting, or causing to be presented, false or fraudulent claims for payment or approval to the United States and have conspired in knowingly making, using, or causing to be made or used, false records or statements material to false or fraudulent claims.

108.     The United States paid the false or fraudulent claims.

109.     By virtue of Defendants' actions, the United States has suffered damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## PRAYER FOR RELIEF

110.     WHEREFORE, Relators respectfully request that the Court enter judgment against the Defendants and award the following:

(1)   Damages in the amount of three (3) times the actual damages suffered by the United States as a result of Defendants' conduct;

(2)   Civil penalties against Defendants up to the maximum allowed by law for each violation of 31 U.S.C. § 3729;

(3)   The maximum award Relators may recover pursuant to 31 U.S.C. § 3730(d);

(4)   All costs and expenses of this litigation, including attorneys' fees and costs of court; and

(5)   All other relief on behalf of Relators or the United States that the Court deems just and proper.

## XI.    DEMAND FOR JURY TRIAL

111.    Pursuant to Federal Rule of Civil Procedure 38, Relators demand a trial by jury.



Respectfully submitted,

**BERG & ANDROPHY**

*/s/Janis G. Gorton*
Joel M. Androphy
TX State Bar No. 01254700
Janis G. Gorton
TX State Bar No. 24071063
3704 Travis Street
Houston, Texas 77002
Telephone (713) 529-5622
Facsimile (713) 529-3785

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 27, 2020, I caused a true and correct copy of this Original Complaint to be served on the United States Department of Justice and the United States Attorney's Office in the Southern District of Illinois via certified mail, return receipt requested.

I further certify that on August 27, 2020, I caused a true and correct copy of this Original Complaint to be sent via electronic mail to William Barr, United States Attorney General, at Civilfrauds.quitams@usdoj.gov.

*/s/Janis G. Gorton*
Janis G. Gorton